In re TOLLMAN–HUNDLEY DALTON, L.P., Debtor.

Bankruptcy No. 91–40553–HR.

United States Bankruptcy Court,
N.D. Georgia,
Rome Division.

Oct. 20, 1993.

---

Karen Fagin White, and William James Reedy, Small, White & Marani, P.C., Atlanta, GA, for debtor.

James Gorsline, Atlanta, GA, for creditor Financial Sec. Assur., Inc.

## MEMORANDUM OF OPINION AND ORDER

HUGH ROBINSON, Jr., Bankruptcy Judge.

This case is before the court on the MOTION FOR AUTHORITY TO UTILIZE ESTATE FUNDS FOR PLAN OF LIQUIDATION filed by Tollman–Hundley Dalton, L.P. ("Debtor") and MOTION FOR ABANDONMENT AND ACCOUNTING OF RENTS, OR IN THE ALTERNATIVE, FOR DEBTOR TO ACCOUNT FOR CASH COLLATERAL filed by Financial Security Assurance, Inc. ("FSA"), a creditor herein. These matters are core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(K). The ensuing discussion constitutes the court's findings of fact and conclusions of law. Fed.R.Bankr.P. 7052. For the following reasons, the court will GRANT the motion of Debtor and DENY the motion of FSA.

### FACTS

Debtor, which owned and operated a Holiday Inn in Dalton, Georgia (the "Hotel"), filed a voluntary petition under Chapter 11 of the Bankruptcy Code on March 1, 1991. FSA was the guarantor of a pre-petition security agreement and has since succeeded to all rights of the original lender Security Pacific Commercial Mortgage Trust ("Security Pacific"). FSA holds a properly perfected first priority security interest in the Hotel real property and improvements, related tangible and intangible personal property, and all rents, issues, profits, revenues, accounts, and other rights associated with the Hotel and its operation. The parties have stipulated that the security agreement was intended to cover all Hotel revenues.

Prior to filing its petition under Chapter 11, Debtor assigned all "income and benefits of every nature whatsoever, including, without limitation, all rents, issues, profits and

revenues derived from" the Hotel to FSA.[1] Debtor subsequently defaulted on its indebtedness to FSA. On February 25, 1991, FSA accelerated the payments due under the security agreement and revoked Debtor's license to collect rents. FSA initiated an action in state court for the appointment of a receiver to collect hotel revenues, but that action was stayed when Debtor filed its voluntary petition.

Debtor operated the Hotel from March 1, 1991 through April 7, 1992, when FSA foreclosed its interest in the Hotel. FSA alleges that Debtor received between Three Million Dollars ($3,000,000.00) and Four Million Dollars ($4,000,000.00) in post-petition receipts from its hotel business. At present, Debtor has in its possession post-petition revenues amounting to approximately Four Hundred Twelve Thousand Dollars ($412,000.00).

Debtor contends that the post-petition revenues are property of the bankruptcy estate by virtue of 11 U.S.C. § 552(a). FSA contends that the post-petition revenues are not property of the estate because of the pre-petition assignment. Alternatively, FSA argues that the Hotel revenues are either rent or profits under 11 U.S.C. § 552(b) and therefore constitute a part of FSA's cash collateral.

## ANALYSIS

### Assignment of Rents

■ In Georgia, an absolute assignment of rents is recognized as valid. *Jones v. United States (In re Jones)*, 77 B.R. 981 (M.D.Ga.1987). This court has previously held, however, that an absolute assignment divests the bankruptcy estate of any interest in such rents only where the lender takes *actual possession* of and *complete control* over the rents. *In re Club Tower, L.P.*, No. 91–71169 (Bankr.N.D.Ga. July 12, 1991) *citing In re Hall Roundtree Assoc.*, No. 86–08771 (Bankr.N.D.Ga. June 25, 1987). Even if the court were to characterize the hotel's revenues as rent, FSA neither took possession of nor exercised complete control over said revenues. The only action which FSA took was its unsuccessful attempt to have a

receiver appointed by the state court to collect the revenues. This single act by FSA fails to meet the requirements set forth in *Club Tower*. Therefore, this court finds that FSA is not entitled to Debtor's post-petition revenues by virtue of the pre-petition assignment.

### The Security Interest

■ Section 552 of the Bankruptcy Code governs pre-petition security interests in a debtor's post-petition revenues. FSA has the burden of showing that the post-petition revenues constitute "rent" or "profit" under section 552(b). *Carlson v. W.J. Menefee Construction Co. (In re Grassridge Ind., Inc.)*, 78 B.R. 978, 980 (Bankr.W.D.Mo.1987).

■ The characterization of post-petition revenues for the purposes of 11 U.S.C. § 552 is governed by state law. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). There is neither case law nor statutory authority in Georgia dealing directly with this issue. However, Georgia's common law background provides the proper context for the interpretation of existing authority.

Early decisions of Georgia courts adopted the common law distinctions between innkeepers and landlords. *See, Bonner v. Welborn*, 7 Ga. 296 (1849). Innkeepers and landlords were differentiated both by the character of the establishment and by the duration of a guest's stay. *Id.* at 307, 318. At common law, innkeepers were deemed to provide services, or "entertainment", to transients for a fee. *Id.* at 307. Landlords typically provided only lodgings to boarders for rent. *Id.* at 307.

The fact that innkeepers charged "fees" as opposed to "rent" was not merely a matter of semantics. Rather, this distinction was based upon the fundamental nature of the innkeeper/guest relationship. At common law, an innkeeper was a professional bailee who was responsible for protecting both the

---

1. The Debtor's "Assignment of Rents And Leases" was made originally in favor of the trustee of Security Pacific. The trustee subsequently assigned its rights thereunder to FSA.

guest and the guest's belongings for a fee.[2] This distinction between innkeepers and landlords served as a basis for assigning different rights, duties, and liabilities to each group at common law.[3] Similar distinctions are recognized in modern Georgia law.[4]

Georgia's statutory scheme for the regulation of the hotel industry belies the notion that innkeepers charge rent.[5] O.C.G.A. § 43–21–1 provides:

(1) "Guest" means a person who pays a *fee* to the *keeper of an inn* for the purpose of *entertainment* at that inn.

(2) "Inn" means all taverns, hotels, and houses of *public general entertainment* for *guests*.

(emphasis added). Innkeepers are, therefore, keepers of houses of public general entertainment for guests. Innkeepers, by definition, are not landlords. Guests, by definition, do not pay rent.

The definition of "rent" provided in the Georgia statutory scheme does not apply in the context of the innkeeper/guest relationship. Rent is the creation of a *written* agreement which conveys a usufruct and establishes the relationship of *landlord and tenant*. O.C.G.A. § 2–10–52. It is settled law that the relationship between a guest and an innkeeper may be, and often is, based on an implied contract rather than a written agreement. *O. Rockwell v. Proctor*, 39 Ga. 105 (1869). It is equally settled that innkeepers are not the same as landlords. *Bonner* at 297–310. Under the plain language of O.C.G.A. § 2–10–52, innkeepers do not charge rent.

Finally, Georgia law allows both innkeepers and landlords to obtain liens on personal property for amounts due from their respective guests or tenants.[6] However, Georgia statutes distinguish between innkeeper's liens for accommodations and landlord's liens for rent. An innkeeper's lien for "food, lodging, or other accommodation" is superior to other liens except "... special liens of landlords for rent ...". O.C.G.A. § 43–21–5. If innkeepers were the equivalent of landlords, and innkeepers charged "rent" as FSA claims, this statute would make an innkeeper's lien subservient to itself. The Georgia legislature surely did not intend such a result.

Clearly, under Georgia law hotel revenues are not properly characterized as rent. This interpretation comports with the majority of state courts which have addressed these issues.[7] However, these courts based their decision on the fact that a hotel guest has no interest in the hotel realty. Although this rationale is valid, it is not applicable in Georgia. Georgia property law is unique in recognizing a property interest known as a usufruct. FSA urges this court to find that guests of a hotel hold a usufruct.

■ Usufructs are rights which generally arise out of the landlord/tenant relationship wherein tenants hold a lesser interest in real estate than an estate for years. *Roe v. Doe*, 246 Ga. 138, 268 S.E.2d 901 (1980). The tenant in a usufruct obtains "the right simply to possess and enjoy the use of such real estate either for a fixed time or at the will of the grantor." O.C.G.A. § 44–7–1(a). In

---

2. See 2 James Kent, Commentaries On American Law, at p. 457–464 (Leonard Levy ed., Da Capo Press 1971) (1827).

3. *See e.g. Murchison v. Sergent*, 69 Ga. 206 (1882).

4. Violations of an innkeeper's duties in O.C.G.A. §§ 43–21–30—43–21–32, 43–21–50, 43–21–61 and 43–21–62 result in criminal liability. An example of innkeeper's special rights can be found in the termination provisions of O.C.G.A. §§ 43–21–3.1(a), 43–21–3.1(b). An innkeeper's liability is governed by O.C.G.A. § 43–21–8. Courts interpreting this statute have declared that an innkeeper is "a professional bailee". *Ellerman v. Atlanta American Motor Hotel Corp.*, 126 Ga.App. 194, 195, 191 S.E.2d 295 (1972).

5. See O.C.G.A. §§ 43–21–1—43–21–62.

6. O.C.G.A. §§ 44–7–70 to 44–7–82 and 44–14–341 (landlord); 43–21–5 to 43–21–6 (innkeeper).

7. *See e.g. In re Chesterfield Century City Ltd. Partnership*, Civ. No. 2–92–119–GEB, 1992 WL 471706 1992 U.S.Dist.Lexis 17363 (E.D.Cal. filed August 18, 1992); *United States v. P.S. Hotel Corp.*, 404 F.Supp. 1188 (E.D.Mo.1975), *aff'd.* 527 F.2d 500 (8th Cir.1975); *Greyhound Real Estate Fin. Co. v. Official Unsecured Creditor's Comm. (In re Northview)*, 130 B.R. 543 (Bankr. 9th Cir.1991).

Georgia, all realty rented for a period of less than five years is deemed to convey only a usufruct unless the parties expressly agree otherwise. O.C.G.A. § 44–7–1(b).

■ Notwithstanding the broad definition applied to usufructs, there are certain characteristics of usufructs which are inconsistent with the innkeeper/guest relationship. Under Georgia law, a usufruct is not a taxable interest. *Macon–Bibb Cty. v. Atlantic S.E. Airlines,* 262 Ga. 119, 122, 414 S.E.2d 635 (1992). Georgia levies both a sales and use tax and an excise tax on hotel occupancy.[8] Consequently, the interest which a hotel guest holds cannot be characterized as a usufruct.

■ The court is of the opinion that a hotel guest pays for a license to use a room. *See Grant v. Haymes,* 164 Ga. 371, 138 S.E. 892 (1927). While both a tenant holding a usufruct and a hotel guest have licenses, the applicable charges for these "licenses" are different. Innkeepers charge fees, and landlords charge rent.

■ As an alternative position, FSA argues that hotel revenues constitute "profits" under 11 U.S.C. § 552(b). FSA has failed to carry its burden of proving that hotel revenues constitute "profits" under Georgia law. FSA has been unable to cite any Georgia authority for the proposition that hotel revenues comprise profits.

Other jurisdictions addressing this issue have concluded that profits "refer to sale of real property to which a security interest was attached and perfected before the bankruptcy filing." *Greyhound Real Estate Fin. Co. v. Official Unsecured Creditor's Comm. (In re Northview),* 130 B.R. 543, 548 (Bankr.9th Cir.1991). This definition is consistent with Georgia law.[9] Having sold the hotel property, FSA has already obtained the "profits" derived from the Hotel. The court is not convinced by FSA's overly broad definition of the term "profit".

FSA also cites several policy reasons for this court to find that hotel revenues constitute rents. FSA urges the court to base such a finding on the fact that post-petition hotel revenues are, to an extent, derivative collateral of hotel property, and the intent of the parties as presented in the security agreements.

These arguments have been considered and rejected by other courts. The fact that hotel revenues are derivative of the underlying property is a truism. All business income, to a certain extent, is derivative of the underlying property. *In re Chesterfield Century City Ltd. Partnership,* Civ. No. 2–92–119–GEB, 1992 WL 471706, 1992 U.S.Dist. Lexis 17363 (E.D.Cal. filed August 18, 1992).

Similarly, the argument that the intent of the parties was to cover post-petition revenues is irrelevant. Secured creditors cannot avoid Congressional mandates by assigning their own meanings to terms used in the Bankruptcy Code. *Id.* 1992 WL 471706, at 3, 1992 U.S.Dist. Lexis 17363, at 7–8.

As a final note, this court joins others in recognizing that although secured creditors will find the result reached here harsh, their remedy lies with the legislative branch. *Id.* 1992 WL 471706, at 4, 1992 U.S.Dist. Lexis 17363, at 9.

In sum, the court finds that under Georgia law hotel revenues do not constitute "rents" or "profits" for the purposes of section 552(b). Therefore, under section 552(a), FSA does not have any interest in the post-petition revenues generated by the Hotel.

Accordingly, Debtor's motion is GRANTED. FSA's motion is DENIED.

**SO ORDERED.**

---

8. O.C.G.A. §§ 48–8–30 and 48–8–51 respectively.

9. The term "profit" is used in the context of income derived from sales and services in general. See O.C.G.A. §§ 14–8–18; 14–8–40(1)–(3); 14–3–140; 48–7–31; *Georgia Osteopathic Hosp. v. Strickland,* 123 Ga.App. 86, 179 S.E.2d 560 (1970).